UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| In re<br>**JOHN B. SHORTON,**<br>    Debtor | Chapter 7<br>Case No. 06-11123-JNF |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

| | |
|---|---|
| **AUBURN DEVELOPMENT CORPORATION,**<br>    Plaintiff<br>v.<br>**JOHN B. SHORTON** | Adv. P. No. 06-1314 |

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matter before the Court is the Complaint filed by Auburn Development Corporation ("Auburn") against the Debtor, John B. Shorton ("Shorton" or the "Debtor"). Through its Complaint, Auburn seeks a determination that the Debtor, a former attorney licensed to practice law in the Commonwealth of Massachusetts, "wrongfully, and fraudulently converted the assets of Auburn Development Corporation, which he held in a fiduciary capacity, for his own use." The Debtor, in his Answer, denied Auburn's allegations. The Court conducted a trial on October 3, 2007 and October 24, 2007 at which two witnesses testified in addition to the Debtor, and seven exhibits were introduced into evidence.

Based upon the testimony and exhibits, the Court now makes findings of fact and

1

rulings of law in accordance with Fed. R. Bankr. P. 7052.

## II. FACTS

The Debtor filed a voluntary petition under Chapter 7 on April 25, 2007. Auburn timely filed a Complaint under 11 U.S.C. § 523(a)(4).

Prior to filing his bankruptcy petition, the Debtor, while he was licensed to practice law, represented Arthur Vallee and the Vallee Realty Trust (collectively "Vallee"). Vallee owned a home located at 37 Stratford Road, Newton, Massachusetts (the "Property"). On September 8, 1999, Vallee and Auburn executed a "Standard Form Purchase and Sale Agreement" pursuant to which Vallee agreed to sell and Auburn agreed to buy the Property for a purchase price of $350,000, subject to the acquisition of a demolition permit and a building permit. The closing was originally scheduled for November 1, 1999 pursuant to paragraph 42 of the Agreement contained in a Rider which amended paragraph 8. That paragraph also provided:

> In the event the buyer has not obtained the permits described in Paragraph 40, this Agreement may be extended, at the buyer's option, for a period of thirty (30) days. In the event the buyer does not extend this Agreement, said Agreement shall be terminated, all deposits shall be refunded to the buyer and those provisions intended to survive such termination shall remain in effect.

Auburn made a deposit of $17,500 toward the purchase price of the Property. The Debtor was denominated escrow agent pursuant to paragraph 20 of the Agreement which provided:

> All deposits made hereunder shall be held in escrow by John B. Shorton, IOLTA Account [sic] as escrow agent subject to the terms of this agreement and shall be duly accounted for at the time for performance of this

agreement. In the event of any disagreement between the parties, the escrow agent may retain all deposits made under this agreement *pending instructions mutually given by the SELLER and the BUYER.*

(emphasis supplied). The Rider to the Agreement contained additional provisions pertinent to the present dispute between Auburn and the Debtor. Paragraph 39 pertained to "Extension of Time for Performance." It provided:

> In the event the mortgage lender has not completed processing the Buyer's mortgage loan application or in the event the attorney for the mortgage lender has not received authorization to proceed with the closing or has not completed examination of the title to the premises, the time for closing in paragraph 8 shall be extended for a period of time requested of the mortgage lender or its attorney.

In addition, paragraph 40, which set forth the permits required for closing, and paragraph 43 also contained language relating to extensions of time for performance. Paragraph 40 provided in relevant part the following:

> a) Subject to obtaining a demolition permit from the City of Newton for removal of the structure on premises. [sic] Said permit to be applied for on or before September 20, 1999 and diligently pursued thereafter. In the event that a permit is not obtained, the time for closing set forth in Paragraph 8 hereto, shall be extended until said permit is granted, provided the buyer continues to use due diligent [sic] in pursuit thereof.
>
> b) Subject to approval of a building permit from the City of Newton Department of Inspectional Services of building permit [sic] for the construction of a two (2) family residential structure on the premises. [sic] Said permit to be applied for on or before October 6, 1999 and diligently pursued thereafter. In the event that a permit is not obtained, the time for closing set forth in Paragraph 8 hereto, shall be extended until said permit is granted, provided the buyer continues to use due diligent [sic] in pursuit thereof.
>
> c) In consideration of the seller granting any such extension, it is further agreed that the cost of obtaining said demolition permit and building permit approval shall be the sole responsibility of the buyer and the seller shall not

>be liable for any costs therefore.  In addition, the buyer shall undertake to obtain a perimeter plan . . . .  The cost of obtaining said plan shall be the responsibility of the buyer and the seller shall not be liable for any costs therefore.

Paragraph 43, captioned "Post-Termination Agreements," provided in relevant part:

>In the event this Agreement is terminated because of the buyer's inability to obtain the permits described in Paragraph 40 hereof:
>
>>a. The parties may extend the terms of this Agreement by mutual agreement;
>>
>>b. The buyer shall have a right of first refusal upon the sale of said property. . . .

The Agreement was conditioned upon obtaining both a demolition permit and a building permit.  In paragraph 41 of the Agreement, Vallee and Auburn recognized that obtaining those permits might be troublesome and require extension of the time for performance.  They stated the following:

>The buyer and the seller are aware that residents of the 37 Stratford Road neighborhood are publicly opposed to the sale of the property by the seller to a buyer who is intent upon demolishing the existing single family structure and constructing a two-family residential structure on the site. Said residents have publicly threatened to file an amendment to the zoning ordinance to prohibit such construction. The parties are aware and recognize that the neighbors may object to the hearing before the Newton Historic Commission for a demolition permit and their opposition may result in a dely in obtaining such a permit. *The seller and the buyer hereby specifically agree that the seller desires to sell the property and the buyer desires to buy the property and to proceed immediately with the construction of a two-family residential unit at the earliest, most practical, reasonable date and, recognizing the difficulties set forth above, the parties agree to work together to achieve such sale.*

(emphasis supplied).

Auburn and Vallee executed three formal extensions of the Agreement.  The first

4

extension was executed on October 29, 1999 and the last extension was executed on November 24, 1999. In the last extension, the parties agreed to extend the time for performance until December 8, 1999. The Agreement, however, did not specifically require the parties to execute written extension agreements.

The parties' recognition of neighborhood opposition was well-founded. Although both Robert P. Flaherty ("Flaherty"), Auburn's principal, and Peter J. Harrington, Esq. ("Harrington"), Auburn's attorney, testified that Auburn fully cooperated in the process of obtaining the requisite permits, Alfonso L. Ferrera ("Ferrera") commenced an action against Vallee and the Planning Board of the City of Newton on December 21, 1999 in the Middlesex Superior Court, Department of the Trial Court. In mid-October, 2000, Vallee succeeded in obtaining dismissal of the suit. Approximately two years later, however, on September 10, 2002, the Superior Court entered a judgment annulling the endorsement of the City Engineer dated October 29, 1999 and remanded the matter to the Newton Planning Board for further proceedings.

Events intervened to render the Superior Court's judgment moot. On January 23, 2002, Vallee sold the Property to a third party unrelated to Auburn. Between the time Ferrera commenced suit in the Superior Court and the time Vallee sold the Property to a third party, Vallee and Auburn cooperated in pursuing the demolition and building permits pursuant to paragraph 41 of their Agreement. For example, on June 21, 2000, William and Patricia O'Brien entered into a lease agreement for the Property, captioned "Tenancy at Will Lease." Flaherty testified that Ms. O'Brien is his sister-in-law and that the

5

lease was intended to defray costs associated with the permitting process.

In the summer of 2000, the Debtor was involved in a proceeding to revoke his license to practice law before the Board of Bar Overseers for conduct unrelated to the conduct involved in the instant matter. On October 21, 2000, the Debtor was disbarred. The Debtor testified that he had incurred substantial legal fees in representing Vallee, noting that the Agreement involved a considerable amount of litigation and time spent in meetings with neighbors and City officials. With his disbarment pending, the Debtor stated that he approached Vallee with a proposal pursuant to which he would withdraw the $17,500 from his IOLTA account to set off against the legal fees which Vallee owed him. In exchange, Vallee would assume responsibility for Auburn's deposit because he had a certificate of deposit in excess of the amount of the deposit. The Debtor testified:

> I set off, I set - - after I discussed this with my attorney and obtained advice from my attorney, who was representing me, and I also spoke with Mike - - Mr. Fredrickson of the Board of Bar Overseers and asked if something - - that could be done. Maybe I didn't get the right advice at that time, . . . but I did it honestly, sincerely, and based on advised [sic] of counsel, and told Mr. Harrington that Mr. Vallee was going to be responsible for the deposit, and Mr. Vallee sent a letter to . . . Mr. Harrington indicating that he was responsible for the deposit and to deal directly with him from  - - from then on.

According to the Debtor, he advised Auburn's counsel, Harrington, that he intended to use some of the deposit toward his bills and that Harrington agreed to the proposal. Additionally, the Debtor produced an unsigned "Notice," dated February 11, 2001, pursuant to which Vallee purportedly advised Auburn that it breached the Agreement and that he intended to retain the deposit as liquidated damages, adding the following: "Also,

6

you are responsible for all costs/fees incurred by the seller who at all times acted diligently and in good faith under his obligations of said contract. Fees incurred are in addition to liquidated damages."[1]

Although the Debtor testified that he had an agreement with Vallee about Auburn's deposit and the payment of his outstanding legal fees, he admitted that Vallee filed an application with the Clients' Security Board of the Supreme Judicial Court asking for the return of the amount of the deposit. Moreover, Auburn commenced an action against Vallee and the Debtor in the Newton District Court with respect to the deposit. Auburn dismissed the action against Vallee after obtaining an assignment of Vallee's interest in the deposit. According to Harrington, Auburn based its decision to dismiss the action against Vallee upon his affidavit in which he represented that "he never received any money, nor had he ever agreed to set off any portion of the security deposit against the debt, or obligation between himself, the trust, or any other person, including John B. Shorton."[2]

Both Harrington and Flaherty unequivocally denied that Auburn breached the Agreement, and they denied receiving any notice from Vallee that Auburn was in default with respect to its obligations under the Agreement. Specifically, Harrington testified that

---

[1] Paragraph 21 of the Agreement provided:

If the BUYER shall fail to fulfill the BUYER'S agreements herein, all deposits made hereunder by the BUYER shall be retained by the SELLER as liquidated damages which shall be sellers [sic] sole remedy at law or in equity.

[2] Because Vallee assigned his interest in the deposit to Auburn, according to Harrington, he was no longer able to proceed before the Clients' Security Board.

7

neither he nor his client received the "Notice" dated February 11, 2001 pursuant to which Vallee purportedly advised Auburn that it was in default under the Agreement and liable for liquidated damages in the amount of the deposit and other costs. Harrington also testified that the Debtor did not notify him that he intended to set off the deposit against his legal fees and that he would never have authorized such a transaction.

Additionally, Harrington and Flaherty denied knowing that Shorton was disbarred in October of 2000, although they learned of his disbarment at a later time.  Harrington stated that he and Auburn learned about Shorton's disbarment about the same time that his client learned about the January 23, 2002 sale by Valle to a third party.

## III. DISCUSSION

In Farley v. Romano (In re Romano), 353 B.R. 738 (Bankr. D. Mass. 2006), this Court summarized the law applicable to section 523(a)(4) of the Bankruptcy Code.  The Court stated:

> Section 523(a)(4) of the Bankruptcy Code provides that "[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). With respect to a defalcation, both the existence of a fiduciary relationship and the defalcation must be proven by a preponderance of the evidence. *See* Rutanen v. Baylis (In re Baylis), 313 F.3d 9, 17 (1st Cir.2002); Grogan, 498 U.S. at 286-287, 111 S.Ct. 654.  In Baylis, the court observed the following with respect to fiduciary capacity:
>
>> Some years ago, the Supreme Court noted that under § 523(a)(4), the exception for fiduciary capacity applies only to express trusts, and not to equitable trusts created by the debtor's conduct. Davis v. Aetna Acceptance Co., 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934). . . .

8

>313 F.3d at 17, n.3. In Moore v. Murphy (In re Murphy), 297 B.R. 332 (Bankr.D.Mass.2003), the court reiterated the observation of the First Circuit: "[t]he definition of 'fiduciary' for purposes of § 523(a)(4) has been narrowly construed. The term applies only to relationships arising out of express or technical trusts, and not to trusts that are implied in law as a remedy." Id. at 348. As a result, the existence of fiduciaries duties alone does not establish fiduciary capacity for purposes of § 523(a)(4), Denton v. Hyman (In re Hyman), 320 B.R. 493, 510 (Bankr.S.D.N.Y.2005), aff'd 335 B.R. 32 (S.D.N.Y.2005), although "[m]ost courts today . . . recognize that the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." LSP Inv. Partnership v. Bennett (In re Bennett), 989 F.2d 779, 784-85 (5th Cir.1993), cert. denied, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993).

Romano, 353 B.R. at 761.

The first issue that the Court must decide is whether the Debtor held Auburn's deposit in an express trust. In Aranha v. Eagle Fund, Ltd. (In re Thornhill Global Deposit Fund, Ltd.), 245 B.R. 1 (Bankr. D. Mass. 2000), aff'd 247 F.3d 328 (1st Cir. 2001), the court summarized Massachusetts law with respect to escrow agreements. It stated:

>In Massachusetts, the term "escrow" can be used with respect to written instruments as well as to deposits of money. See Childs v. Harbor Lounge of Lynn, Inc., 357 Mass. 33, 35, 255 N.E.2d 606 (1970); Kaarela v. Birkhead, 33 Mass.App.Ct. 410, 412-13, 600 N.E.2d 608 (1992). The sparse Massachusetts case law thus defines a deposit in escrow to mean "to deliver it to a third party to be held until the performance of a condition or the happening of a certain event." Childs, 357 Mass. at 35, 255 N.E.2d 606. The third party escrow agent becomes the fiduciary of both the depositor and the grantee; she can not remain the agent of either in regards to the deposited funds. See Birkhead, 33 Mass.App.Ct. at 412-13, 600 N.E.2d 608. The escrow agent has a duty to keep the deposit and can not dispose of it except pursuant to the terms of the underlying agreement. See id.

245 B.R. at 12.

The Court finds that paragraph 20 of the Agreement created an express trust which

imposed fiduciary duties upon the Debtor to place Auburn's deposit in his IOLTA account, to account for Auburn's deposit, and to retain the deposit in the event of a disagreement *"pending instructions mutually given by the SELLER and the BUYER." (*emphasis supplied). Indeed, IOLTA stands for "Interest on Lawyers' Trust Accounts," and Rule 1:15(a)(1) of the Massachusetts Rules of Professional Conduct defines trust property as "property of clients or third person that is in a lawyer's possession in connection with a representation and includes property held in any fiduciary capacity in connection with a representation whether as trustee, agent, escrow agent, guardian, executor, or otherwise." Thus, the Court finds that the Debtor held Auburn's deposit in an express trust account and that the Agreement imposed fiduciary duties upon him as escrow agent with respect to his handling of the deposit in the escrow account.

The next issue is whether the Debtor committed a defalcation while acting in a fiduciary capacity. In <u>Rutanen v. Baylis (In re Baylis)</u>, 313 F.3d 9 (1st Cir.2002), the First Circuit examined the level of culpability required for a debt to be declared nondischargeable under section 523(a)(4) with respect to a defalcation while acting in a fiduciary capacity. It stated "defalcation must mean something other than fraud and different from 'willful and malicious injury,'" and it must be measured objectively. <u>Id.</u> at 17. The First Circuit explained:

> Defalcation may be presumed from breach of the duty of loyalty, the duty not to act in the fiduciary's own interest when that interest comes or may come into conflict with the beneficiaries' interest:
>
> > A trustee occupies a position in which the courts have fixed a very high and very strict standard for his conduct whenever

10

> his personal interest comes or may come into conflict with his duty to the beneficiaries. As long as he is not acting in his own interest the standard fixed for his behavior is only that of a reasonable degree of care, skill, and caution. But when the trustee acts in his own interest in connection with the performance of his duties as trustee, the standard of behavior becomes more rigorous. In such a case his interest must yield to that of the beneficiaries.
>
> 2A id. § 170.25. As with the other fault-based exceptions, fault may be presumed from the circumstances, here a violation of the duty of loyalty.

313 F.3d at 20-21.

The Court finds that the Debtor committed a defalcation while acting in a fiduciary capacity. Not only did he breach the express terms of the escrow, he was acting in his own self-interest when he elected to utilize Auburn's deposit for the payment of his outstanding legal fees at a time when he was aware that he was about to lose his license to practice law in the Commonwealth. Vallee's certificate of deposit over which he had unfettered control was not a substitute for or equivalent to a trust account.

The Debtor was obligated to act as a fiduciary for his client, Vallee, and Auburn with respect to Auburn's deposit. His unilateral decision to set off Auburn's deposit against the legal fees owed to him by Vallee was a breach of his fiduciary duty and contrary to the express terms of paragraph 20 of the Agreement. His action was motivated by self-interest, and his testimony that Vallee's certificate of deposit was an adequate substitute was both unsubstantiated by corroborating evidence as to its existence and amount and, more significantly, incredible.

The Debtor attempted to justify his unilateral action with respect to Auburn's

deposit with reference to Auburn's alleged breach of the Agreement. His testimony, however, was unpersuasive. Although the parties executed several documents extending the time for performance, and paragraph 8 of the Agreement provided that "time is of the essence," paragraph 39 and the provisions of paragraphs 40, 41, and 43, all of which were set forth in the Rider to the Agreement, contradict that provision. The Agreement, as a whole, reflects the parties' intention to work together to resolve the issues pertaining to acquisition of the permits and neighborhood opposition. The parties' execution of various extension agreements was superfluous in view of the provisions expressing their intention to extend the time of performance until the permits were obtained. Indeed, paragraph 43 of the Agreement provided that even after termination "[t]he parties may extend the terms of this Agreement by mutual agreement" if Auburn was unable to obtain the permits. Thus, the Court finds that the Agreement was not terminated because of the absence of written extensions or breach of the Agreement by Auburn. On the contrary, it appears that Vallee breached the Agreement by failing to provide Auburn with a right of first refusal in advance of conveying the Property to a third party on January 23, 2002 pursuant to paragraph 43 of the Agreement.

Although the Debtor produced a Notice, which he testified Vallee signed and mailed to Auburn in his presence, that Notice, which was dated February 11, 2001, was provided, if at all, approximately four months after his disbarment and approximately six months after he testified the he exchanged Auburn's deposit for Vallee's certificate of deposit. In the spring and summer of 2000, the parties were working together to resolve the various

issues relating to the permitting process. Vallee and the O'Briens had executed a Tenancy at Will Agreement and the litigation in the Middlesex Superior Court was proceeding with the involvement of the Debtor who had succeeded in obtaining dismissal of Ferrera's Complaint just days before his disbarment. Thus, if Auburn breached the Agreement, it did so after the Debtor applied its deposit to his legal fees. The Debtor applied the deposit to his legal fees without notice to Auburn of his intention to do so, without providing Auburn with an opportunity to object to the termination of the escrow, without notice to Auburn that it was in breach of its commitments under the Agreement, and without providing Auburn with an opportunity to enforce paragraph 20 of the Agreement. The Debtor's conduct violated the duty of loyalty described in Baylis, 313 F.3d at 20, and constituted a defalcation while acting in a fiduciary capacity.

## IV. CONCLUSION

In view of the foregoing, the Court finds the Debtor's obligation to Auburn is nondischargeable pursuant to 11 U.S.C. § 523(a)(4). The Court shall enter judgment in favor of Auburn and against the Debtor.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: December 3, 2007
cc: John B. Shorton, N. Jeannette Robinson, Esq.